

FILED
SUPERIOR COURT
OF GUAM

2020 SEP 21 AM 8:00

CLERK OF COURT

By:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| MARCUS LANG,<br><br>               Petitioner,<br><br>vs.<br><br>DEPARTMENT OF PUBLIC HEALTH AND SOCIAL SERVICES<br><br>GUAM MILITARY BUILDUP OFFICE<br><br>GOVERNMENT OF GUAM,<br><br>               Respondents. | **Superior Court Case No. <u>SP0130-20</u>**<br><br>**DECISION AND ORDER** |

The Court here considers Petitioner Marcus Lang's Verified Petition for a Writ of Habeas Corpus and Injunctive Relief against Respondents Department of Public Health and Social Services (DPHSS), the Guam Military Buildup Office (GMBO), and the Government of Guam. Finding that personal jurisdiction may not be exercised against Respondents, the Court DISMISSES this action.

### I. PROCEDURAL BACKGROUND

On September 16, 2020, Lang filed a Verified Petition for a Writ of Habeas Corpus and Injunctive Relief. He claimed that on September 8, 2020, DPHSS and the Government of Guam placed him into mandatory quarantine. V. Pet. ¶ 2. He sought a Writ of Habeas Corpus and an order enjoining his further confinement in quarantine. V. Pet. at 10. He also sought an order requiring that he quarantine at home. V. Pet. at 10.

On September 17, 2020, the Court issued an Order to Show Cause to Respondents requiring they show cause why he should not be released from quarantine. From September 17 to 19, 2020, the Court heard testimony from DPHSS Director Arthur San Agustin, DPHSS COVID-19 Containment/Isolation Lead Chima Mbakwem, GMBO Coordinator Vera Topasna, and Lang. The Court consolidated the evidentiary hearing in this case with other matters involving DPHSS' quarantine and DPHSS Guidance Memo 2020-11 Rev7 ("Rev7").[1]

## II.   FACTUAL FINDINGS

The Court makes the following findings based on a preponderance of the evidence:

1. Cabras Marine Corporation, a local corporation, employs Lang as an Assistant Port Engineer. He is licensed as a Chief Engineer. Cabras is charged with general maritime operations of Guam's port--for example, assuring the safe arrival and departure of commercial ships transporting goods to and from Guam and the safe arrival and departure of U.S. Navy warships and transports. It contracts with the military and with the Government of Guam.

2. In mid-August, Lang left island and stayed in California for three weeks.

3. In anticipation of his return to Guam, Lang acquired a COVID-19 test and tested negative.

4. On August 31, 2020, Cabras' Human Resources Director, Wayne Bigler, wrote a letter to DPHSS Director Arthur San Agustin advising that Lang will return to Guam on September 8, 2020, with a negative PCR test. The letter stated the nature of Lang's work and the restriction of movement that Lang would follow. Ex. DD.

5. On September 6, 2020, Cabras wrote a letter "to whom it may concern" advising that it

---

[1] SP0129-20; SP0131-20; and SP0132-20.

provides essential services and that Lang holds Chief Engineer credentials under the U.S. Coast Guard. Ex. 2.

6. On September 7, 2020, DPHSS issued Rev7. Rev7 required mandatory quarantine of all incoming passengers, with certain exemptions.

7. One such exemption applied to Vessel Crew Members. Exempted vessel crew members were required to adhere to home quarantine restriction of movement guidelines. Rev7 at 8. They must also sign a Voluntary Quarantine Acknowledgement. Rev7 at 8.

8. Another exemption pertained to the Department of Defense (DOD) prime contractors and active-duty members. According to Rev7, such persons listed "on the Joint Task Force listing will follow quarantine guidelines and restriction of movement as established by DOD." Rev7 at 11. However, persons not on the Joint Task Force listing were to be treated as general public passengers under Rev7 and subject to mandatory quarantine. Rev7 at 11. According to San Agustin, persons named on the Joint Task Force listing undergo processing in a separate area manned by DOD officials.

9. Lang arrived on Guam on September 8, 2020. He carried with him a negative test result dated September 4, 2020. Ex. W.

10. While Lang was en route to Guam, Bigler informed him that he qualified under the Vessel Crew Member exemption but would have to quarantine at a Cabras vessel.

11. When Lang arrived on Guam, he filled out a DPHSS Voluntary Quarantine Acknowledgement committing that he will abide by a voluntary quarantine. Ex. EE. He also filled out a Voluntary Quarantine Letter pre-signed by San Agustin and listed his address as "Vessel (Endeavor)." *Id.*

12. When reviewing his Voluntary Quarantine Letter during the evidentiary hearing, Lang

noted that "MIL-Q Westin" is written in the address information line. The notation is in a different font and handwriting than his, and Lang does not know who wrote it. Ex. EE.

13. DPHSS filled out a Final Disposition of Passenger, an internal form DPHSS uses to track incoming passengers. It indicates pre-approval by military command (as opposed to pre-approval by DPHSS). It also indicates transit to a vessel, the Endeavor, which is a Cabras vessel. Ex. EE.

14. San Agustin testified that Lang was listed on the Joint Task Force listing.

15. Once Lang filled out the quarantine forms, DPHSS representative Frank Taitano escorted him outside of the airport and to a Cabras employee for transport to the Endeavor. While en route to the Endeavor, Bigler called and told Lang to return to the airport, that something was not right with his paperwork, and to call Chief Harrison with the DOD.

16. Once Lang arrived at the airport, Taitano asked whether he had his voluntary quarantine forms and advised him that they were not the correct forms. Taitano also stated that because of Cabras' contract with the Navy, Lang would quarantine under the DOD. Lang asked if he had any other option and Taitano replied that he could face a $1000.00 fine, a misdemeanor charge, and possible jail time if he chose not to quarantine.

17. Taitano then escorted him to Chief Harrison from the DOD. Chief Harrison gave no information as to why he had to quarantine through the DOD.

18. During the trial, Lang testified that when he returned to the airport, he filled out a form entitled "Public Health Restriction of Movement Quarantine Order - Non-Essential," similar to the form admitted as Exhibit 3. This DOD document outlines restriction of movement ("ROM") procedures for non-essential persons and explains that the procedures are governed by certain DOD orders. Exhibit 3 also requires that "You must

sign any required Government of Guam . . . Voluntary Quarantine Acknowledgement paperwork. You must provide to GovGuam and your responsible command your quarantine location address and a working phone number where you may be reached." Ex. 3 at 1. Exhibit 3 also advises of the right to contest the issuance of the order. Ex. 3 at 1.

19. Because Lang's professional licenses would be rendered void if he has a criminal record, he assented to the DOD's quarantine and was placed at the Westin Hotel.

20. The DOD utilizes the Westin Hotel as one of its quarantine facilities. The Government of Guam utilizes other hotels for its quarantine facilities.

21. At the Westin Hotel, Lang was advised that he could not leave the room. He was not given a room key card and has not left the hotel room since September 8, 2020.

22. Lang is personally responsible to the Westin for the cost of the hotel room and all of his meals. Lang testified that he was informed he was being charged for the hotel room because he had no sponsor.

23. On the second day of his quarantine, he had a conversation with Topasna who in her role with GMBO acts as a liaison between the Government of Guam and the DOD on growth and community issues. She advised Lang that she was working on getting his approval for ROM.

24. On September 12, 2020, Bigler provided Topasna with a U.S. Coast Guard document which categorizes mariners as essential workers. Ex. CC at 6. Bigler stated that there was a critical need for Lang's return to work. Ex.CC at 6.

25. On that same day, Topasna emailed San Agustin stating that although Lang was denied mission-essential status by DOD, Cabras provides services to the Government of Guam.

She "defer[red] to DPHSS for final disposition." Ex. CC at 6. A day later, Topasna again wrote to San Agustin asking for him to consider her September 12 email. Ex. CC at 6. There is no evidence that San Agustin responded to her email.

26. Topasna testified that San Agustin took the position that he would not override the DOD's determination that Lang did not have mission-critical status.

27. Around September 14, Lang called the 311 hotline established for community COVID-19 inquiries. A Government of Guam representative answered the call and in turn, raised the issue of Lang's request to be considered for ROM as a critical service worker to Topasna and Sam Aptekar, an employee in DPHSS Director's Office. Ex. Y at 3. Topasna responded and cc'd Lang that the request had been forwarded to DPHSS for disposition. Ex. Y at 2.

28. Lang responded to the email seeking clarification as to his status and seeking assistance. Ex. Y at 1. Lang received no response.

29. Aptekar responded to Topasna (but not to Lang) asking whether Lang's request falls under DOD. Ex. Y at 2. However, there appears to be no further discussion from Government of Guam officials to the chain of emails arising from Lang's call to 311.

30. On September 16, 2020, STSC Rick Cornthwaite of the Department of the Navy informed Topasna that "Lang is likely going to be requesting movement to one of your facilities." Ex. CC at 1.

31. Topasna did not respond to Cornthwaite.

32. On September 17, 2020, Lt. Luis Rodriguez from Naval Base Guam emailed Lang asking if he wanted his quarantine to be transferred to and be conducted by the Government of Guam. Ex. Z at 5.

33. Upon further communications with Lang and Lang's attorney, Lt. Rodriguez informed Lang that his status as an employee of a prime contractor for the DOD placed him under DOD's ROM requirements. It also informed him that DOD had denied his prior request for an exception to DOD's ROM policy. However, it did inform him that he could seek permission from DPHSS to enter their quarantine and be subject to DPHSS quarantine policies and regulations. Until such permission was given, Lang "remain[ed] subject to Naval Base Guam restriction of movement policies." Ex. Z at 1.

34. On September 19, 2020, Lang's attorney asked a Navy representative to confirm whether, upon written confirmation from DPHSS that Lang may be released from the Westin, the Navy would have no issues with his release. ENS Shane Teig responded that "if GovGuam gives their concurrence for an exception to policy for ROM location, the Navy would have no issue with the location." Ex. X.

35. While in quarantine, Lang tested negative for COVID-19. Ex. W.

## III.   LEGAL DISCUSSION

Lang seeks a writ of habeas corpus and alleges violations of his due process rights. When issued, a writ of habeas corpus inquires into the cause of imprisonment or restraint. 8 GCA § 135.10. The application for a writ shall specify the officer or person by whom he is so confined or restrained. 8 GCA § 135.12.

Respondents challenge the exercise of jurisdiction over them; however, Respondents have not cited any particular statute or authority governing the jurisdictional analysis. The Court presumes that Respondents seek a ruling, prior to a decision on the merits of Lang's claims for due process violations, that there is no personal jurisdiction over Respondents.

In the habeas corpus case *Aguon v. Beckron*, 2020 Guam 7, the Guam Supreme Court

examined whether it had personal jurisdiction over the Department of Corrections (DOC) concerning a prisoner serving a locally imposed sentence who was confined to a federal institution pursuant to an agreement between DOC and the Federal Bureau of Prisons. The court concluded that because of the arrangement between local and federal authorities, local authorities retained custody over the inmate and thus subject matter jurisdiction was proper despite DOC not having actual custody. *Id.* ¶ 14. The court further concluded that it had personal jurisdiction over DOC because DOC had the ability to produce the inmate before the court. *Id.* ¶ 19. As *Aguon* states, in habeas corpus litigation, "the crucial element of personal jurisdiction does not refer to the court's jurisdiction over the person whose liberty is sought, but rather to the court's jurisdiction over the *custodian* whose act of restraint is being challenged." *Id.* ¶ 15.

Based on the admitted evidence, there appears to be coordination between the Government of Guam and the DOD as to the island community's response to COVID-19. Upon a person's arrival into Guam, if that person is an active duty member or a dependent thereof or an employee of a prime contractor and listed on the Joint Task Force listing, he potentially falls under Rev7's exemption for mandatory quarantine and becomes eligible to instead follow DOD's quarantine guidelines. The military then takes over the arriving passenger and uses facilities separate from DPHSS facilities to quarantine with potential restrictions of movement. The DOD also requires that individual to sign DOD quarantine forms, including Exhibit 3. Although DPHSS initially processed Lang as a Vessel Crew Member, he was listed under the Joint Task Force listing which rendered him subject to the DOD exemption. Under that exemption, Lang signed the DOD's quarantine forms and entered the DOD's custody.

Once DOD exercised custody over Lang, DOD's policies were substituted for DPHSS' quarantine policies. Communications between DPHSS and the DOD confirm that DPHSS

officials understood this to be the case. DOD's correspondence indicates that they require such persons to exclusively follow DOD's quarantine policies and regulations. According to Lt. Rodriguez, in response to Lang's inquiry, "you are an employee of a prime contractor for the Department of Defense, which would place you under DOD ROM requirements as outlined in Naval Base Guam Public Health Restriction of Movement Standard Operating Procedure - Revision Seven." Ex. Z at 1. Lt. Rodriguez did also indicate that he may transfer Lang to the Government of Guam quarantine upon receipt of the Government of Guam's permission. Ex. Z at 1.

The Government of Guam and its agencies do not control the quarantine facility at the Westin. While it appears that Lang may be able to transfer to a DPHSS facility if DPHSS consented,[2] the present question before the Court is not whether he could transfer but whether any of the Respondents currently have him in custody for personal jurisdiction purposes. Apparent among the various local and federal policies and communications, the simple answer is that Respondents do not have Lang in custody and would not be able to produce him if directed to by this Court. Unlike in *Aguon*, the arrangements between local and federal authorities did not provide DPHSS with the authority to continue to dictate Lang's quarantine conditions. The DOD has made clear that he continues to fall under DOD quarantine policies, and that any due process rights owed derive from such policies.

Personal jurisdiction is a threshold issue. *Aguon*, 2020 Guam 7 ¶ 10. Absent personal jurisdiction over Respondents, this matter may not proceed.

---

[2] This has not been brought as an action for a Writ of Mandamus. Even if it had, the Court questions whether DPHSS' decision to not accept a transfer thus far is an act of discretion as opposed to a ministerial duty. *Limtiaco v. Guam Fire Dept.*, 2007 Guam 10 ¶ 25 (mandamus is appropriate only where there is a clear, present and ministerial duty to act).

## IV.    CONCLUSION

Personal jurisdiction may not be exercised over DPHSS, GMBO, or the Government of Guam in this instance. Lang's request for relief to be released from quarantine has not been brought against the appropriate entities in this case. For that reason, his Petition is DISMISSED.

SO ORDERED this 20th day of September 2020.

_____
**HON. ELYZE M. IRIARTE**
**Judge, Superior Court of Guam**

Appearing Attorneys:
Jacqueline Taitano Terlaje, Esq., Law Office of Jacqueline Taitano Terlaje, P.C. for Petitioner
    Marcus Lang
Assistant Attorney General Sandra Miller, Esq., Office of the Attorney General, for Respondents
    DPHSS, GMBO, and Government of Guam